**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEPHANIE DORRIS individually and on behalf of all others similarly situated,<br><br>                Plaintiff,<br><br>    v.<br><br>DANONE WATERS OF AMERICA,<br><br>                Defendant. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Stephanie Dorris ("Plaintiff"), by and through her attorneys, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief—except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge—against Defendant Danone Waters of America ("Defendant").

## <u>NATURE OF THE ACTION</u>

1.      This is a class action lawsuit on behalf of purchasers of Defendant's product, "Evian Natural Spring Water" bottled water (the "Product"), in the United States.

2.      Defendant manufactures and sells a number of water bottles under the "Evian" label.  Defendant sells this product throughout the United States, including in California.

3.      Defendant holds itself out as an environmentally friendly brand.

4.      One of Defendant's products is "Evian Natural Spring Water," which is a "wide range of convenient plastic water bottles to help hydrate and revitalize [consumers] throughout the day."[1]  The Product comes in five different sizes: 300mL, 500 mL, 750 mL, 1L, and 1.5L, and the Product is sold individually, in six-packs, and in twenty-four-packs.

---

[1] *The Everyday Range*, EVIAN, https://www.evian.com/en_us/natural-spring-water/bottled-water/ (last visited Sept. 15, 2022).

1

5.     On the labels and/or packaging of all versions of the Product, Defendant

represents that the Product is "carbon neutral":

 



6.     Reasonable consumers reviewing the Product's label and packaging would

believe the manufacturing of the Product is sustainable and does not leave a carbon footprint

based on Defendant's representations.  However, Defendant's representation that the Product is

carbon neutral is false: Defendant's manufacturing of the Product still causes carbon dioxide

("CO2") to be released into the atmosphere.  Accordingly, the carbon neutral claim is false and

misleading because the Product's manufacturing process is not carbon neutral, and consumers

would not have purchased the Product, or paid substantially less for it, had they known the carbon neutral claim was not true.

7.      Defendant may contend that "carbon neutral" means that the "carbon credits" Defendant purchases theoretically "offset" the carbon emissions produced by its Product. Notwithstanding that, this explanation appears nowhere on the Product and reasonable consumers would not understand that to be the meaning of carbon neutral.  Rather, Defendant's representations would *still* be false under the "carbon offset" definition.  As explained below, the organizations Defendant works with that are the basis for its "carbon credits" do not currently or actually reduce CO2 emissions, and thus do not "offset" the CO2 emissions created by Defendant's production of the Product in any manner.  Accordingly, even under the "carbon offset" definition of "carbon neutral," Defendant's claim is still false.

8.      Plaintiff is a purchaser of the Product who asserts claims on behalf of herself and similarly situated purchasers of the Product for (i) violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civil Code §§ 1750, *et seq.*, (ii) violation of New York General Business Law ("GBL") § 349, (iii) violation of GBL § 350, (iv) breach of express warranty, (v) breach of implied warranty, (vi) unjust enrichment, and (vii) fraud.

## PARTIES

9.      Plaintiff Stephanie Dorris is a resident of Alameda County, California who has an intent to remain there, and is therefore a citizen of California.  Plaintiff Dorris has purchased the Product multiple times.  Most recently, on August 16, 2022, Plaintiff purchased a box of the 1-liter variant of the Product from Amazon for approximately $19.99.  Prior to her purchase of the Product, Plaintiff Dorris reviewed the Product's labeling and packaging and saw that the Product was labeled and marketed as "carbon neutral."  In purchasing the Product, Plaintiff Dorris relied on Defendant's representations that the Product was carbon neutral.  Plaintiff Dorris saw these

representations prior to, and at the time of purchase, and understood them as representations and warranties that her Product was carbon neutral.  Plaintiff Dorris understood "carbon neutral" to mean that the Product's manufacturing did not produce CO2 or otherwise cause pollution. Plaintiff Dorris relied on these representations and warranties in deciding to purchase the Product.  Accordingly, those representations and warranties were part of the basis of the bargain, in that she would not have purchased the Product on the same terms had she known those representations were not true.  In making her purchase, Plaintiff Dorris paid a substantial price premium due to the false and misleading carbon neutral claim.  Had Plaintiff Dorris known that the carbon neutral claim was false and misleading, Plaintiff Dorris would not have purchased the Product.  Plaintiff Dorris did not receive the benefit of her bargain because the Product was not, in fact, carbon neutral in that its manufacturing produced CO2 or caused pollution.

10.     Defendant Danone Waters of America, Inc. is a corporation incorporated under the laws of the state of New York, with its principal place of business in White Plains, New York.  Defendant markets, sells, and distributes the Product throughout the United States, including in the States of California and New York.  Defendant manufactured, marketed, and sold the Product during the class period.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(a) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00 exclusive of interest and costs, there are over 100 members of the putative class, and at least one class member is a citizen of a state different than Defendant.

12.     This Court has personal jurisdiction over Defendant because Defendant is incorporated and maintains its principal place of business in New York.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this District.

## FACTUAL ALLEGATIONS

### A.     The Climate Crisis

14.     There is a growing concern about the climate crisis, which the United Nation describes as "the defining crisis of our time."[2]  A study in 2021 found that an astounding seventy-eight percent of people—around the globe and across all demographics—are increasingly feeling the collective threat of man-made damage to the planet.[3]  Anxieties about human-induced harm to the planet are seen across all age groups, gender, and educational and sociocultural backgrounds, with climate change ranking as the most important global environmental concern of our time, followed by water and air pollution.[4]

15.     At the crux of climate change is the "greenhouse effect."  The greenhouse effect is the natural warming of the Earth that results when gases in the atmosphere trap heat from the sun that would otherwise escape into space.[5]  While thirty percent of solar energy that reaches Earth reflects back to space, roughly seventy percent of the solar energy is absorbed by Earth's land, oceans, and atmosphere.[6]  Eventually, the heat that was absorbed by Earth is radiated back in the form of invisible infrared light.[7]  While a small amount of the infrared light continues into

[2] *See The Climate Crisis – A Race We Can Win*, UNITED NATIONS, https://www.un.org/en/un75/climate-crisis-race-we-can-win (last visited Sept. 16, 2022); *The Climate Crisis: Working Together for Future Generations*, U.S. DEPARTMENT OF STATE, https://www.state.gov/policy-issues/climate-crisis/ (last visited Sept. 16, 2022).

[3] Michael Sheldrick, *Increasing Global Concern About The Climate Is A Message To World Leaders*, FORBES (Oct. 28, 2021), https://www.forbes.com/sites/globalcitizen/2021/10/28/increasing-global-concern-about-the-climate-is-a-message-to-world-leaders/?sh=6db94ac3c11f.

[4] *Id.*

[5] Melissa Denchak, *Greenhouse Effect 101*, NATURAL RESOURCES DEFENSE COUNCIL (July 16, 2019), https://www.nrdc.org/stories/greenhouse-effect-101.

[6] *Id.*

[7] *Id.*

space, approximately ninety percent is absorbed by atmospheric gases ("greenhouse gases"), and

these gases are redirected back to Earth, which further warms the Earth.[8]  Below is a depiction of

the greenhouse effect[9]:



16.      Greenhouse gases from human activities are the most significant driver of

observed climate change since the mid-20th century.[10]  For 800,000 years, longer than human

civilization has existed, the concentration of greenhouse gases in the atmosphere was between

200 and 280 parts per million.[11]  However, in the past century, that concentration has jumped to

more than 400 parts per million, which is driven by human activities such as burning fossil fuels

---

[8] *Id.*

[9] *Why We Measure & Track GHGs*, UMASS LOWELL, https://www.uml.edu/office-sustainability/Practices/Air-Climate/Greenhouse-Gas-Information.aspx (last visited Sept. 16, 2022).

[10] *Greenhouse Gases*, CLIMATE CHANGE RESOURCES, https://climatechangeresources.org/greenhouse-gases/ (last visited Sept. 16, 2022).

[11] Melissa Denchak, *Greenhouse Effect 101*, NATURAL RESOURCES DEFENSE COUNCIL (July 16, 2019), https://www.nrdc.org/stories/greenhouse-effect-101.

and deforestation.[12]  The higher concentrations of greenhouse gases—particularly carbon

dioxide—are causing extra heat to be trapped and climate change.[13]

17.     Carbon dioxide is the primary greenhouse gas emitted through human activities.[14]

In 2020, CO2 accounted for about seventy-nine percent of all U.S. greenhouse gas emissions

from human activities.[15]  While CO2 is naturally present in the atmosphere, humans are

disrupting the Earth's natural carbon cycle.[16]  Specifically, humans are introducing more CO2

into the atmosphere while destroying the natural sinks—such as trees and soil—that remove and

store CO2 from the atmosphere.[17]  Thus, efforts to combat the threat of climate change are

heavily focused on the carbon cycle.

18.     There is worldwide recognition that the Earth's climate is changing and that

climate change is a crisis.[18]  Climate change is evidenced by changing temperatures and

precipitation patterns, increases in ocean levels and acidity, melting glaciers and sea ice, changes

in frequency of extreme weather events, and shifts in ecological characteristics such as length of

harvesting seasons and bird migration patterns.[19]  Furthermore, climate change is affecting

Americans in far-reaching ways: wildfires are increasingly destroying homes and decreasing air

quality; extreme heat and downpours are affecting infrastructure like roads, rail lines, airports,

---

[12] *Id.*

[13] *Id.*

[14] *Overview of Greenhouse Gases*, US ENVIRONMENTAL PROTECTION AGENCY, https:// www.epa.gov/ghgemissions/overview-greenhouse-gases (last visited Sept. 16, 2022).

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *See The Climate Crisis – A Race We Can Win*, UNITED NATIONS, https://www.un.org/en/un75/ climate-crisis-race-we-can-win (last visited Sept. 16, 2022); *The Climate Crisis: Working Together for Future Generations*, U.S. DEPARTMENT OF STATE, https://www.state.gov/policy-issues/climate-crisis/ (last visited Sept. 16, 2022).

[19] *Basics of Climate Change*, US ENVIRONMENTAL PROTECTION AGENCY, https://www.epa.gov/climatechange-science/basics-climate-change (last visited Sept. 13, 2022).

port facilities, energy infrastructure, and military bases; the rise of sea levels and coastal storms has increased the risk of erosion and flooding for coastal communities; climate disruption to agriculture is projected to diminish the security of America's food supply; the changing chemistry of ocean water is altering marine-based food production and harming fishing communities; and, longer harvesting seasons increase pollen production, intensifying and lengthening the allergy season.[20]

19.    To combat the harms of climate change, nearly every nation on Earth adopted the Paris Agreement in 2015.[21]  The Paris Agreement is a legally binding international treaty, which aims to limit global warming through "global peaking" of greenhouse gas emissions as soon as possible.[22]  Subsequently, in 2021, the European Union adopted the Climate Law and, in 2022, President Biden signed the Inflation Reduction Act, both of which aim to reduce greenhouse gas emissions.[23]

20.    Because of the widespread concern about the climate crisis, consumers have increasingly sought out environmentally sustainable products.  According to a study by IBM and the National Retail Federation, nearly seventy percent of consumers in the United States and

---

[20] U.S. Global Change Research Program, *Climate Change: Impacts on Society*, GLOBALCHANGE.GOV, https://www.globalchange.gov/climate-change/impacts-society (last visited Sept. 13, 2022).

[21] *The Paris Agreement*, UNITED NATIONS CLIMATE CHANGE, https://unfccc.int/process-and-meetings/the-paris-agreement/the-paris-agreement (last visited Sept. 13, 2022).

[22] *Id.*

[23] *What is carbon neutrality and how can it be achieved by 2050?*, NEWS: EUROPEAN PARLIAMENT (Sept. 7, 2022), https://www.europarl.europa.eu/news/en/headlines/society/ 20190926STO62270/what-is-carbon-neutrality-and-how-can-it-be-achieved-by-2050; Nadja Popovich and Brad Plumer, *How the New Climate Bill Would Reduce Emissions*, THE NEW YORK TIMES (Aug. 12, 2022), https://www.nytimes.com/interactive/2022/08/02/climate/manchin -deal-emissions-cuts.html?name=styln-domestic-policy-bill&region=TOP_BANNER&block= storyline_menu_recirc&action=click&pgtype=Interactive&variant=show&is_new=false.

Canada think it is important that a brand is sustainable or eco-friendly.[24]  The same study also found that seventy percent of respondents who valued sustainability would be willing to pay, on average, thirty-five percent more for eco-friendly brands.[25]  In other words, modern consumers purchase products that claim to be environmentally friendly and are even willing to pay more for such products over their non-sustainable competitors.

21.     However, the trend of consumers seeking out ostensibly eco-friendly products has created a marketing tactic called "greenwashing."  "Greenwashing is the process of conveying a false impression or providing misleading information about how a company's products are more environmentally sound … [C]ompanies engaged in greenwashing typically exaggerate their claims or the benefits in an attempt to mislead consumers."[26]  Companies make greenwashing claims to "capitalize on the growing demand for environmentally sound products."[27]

22.     Defendant is one such company that has engaged in "greenwashing" through its marketing of the Product.

---

[24] Dinara Bekmagambetova, *Two-Thirds of North Americans Prefer Eco-Friendly Brands*, Study Finds, Barron's, Jan. 10, 2020, https://www.barrons.com/articles/two-thirds-of-north-americans-prefer-eco-friendly-brands-study-finds-51578661728.

[25] *Id.*

[26] GREENWASHING, INVESTOPEDIA, https://www.investopedia.com/terms/g/greenwashing.asp.

[27] *Id.*

**B.     Plaintiff and Reasonable Consumers Were Misled by Defendant's "Carbon Neutral" Representation on the Product**

**1.     "Carbon Neutral" Is an Ambiguous and Deceptive Term**

23.     Carbon neutral is technically defined as "having or resulting in no net addition of carbon dioxide to the atmosphere."[28]  However, according to a recent study, nearly sixty percent of American consumers do not understand what the term "carbon neutral" means.[29]

24.     Even among Americans who identify as environmentalists (*i.e.*, those who have changed their consumer behavior due to a concern about climate change), less than half could correctly identify the meaning of carbon neutral.[30]  Likewise, politicians, businesses, scientists, and experts driving the climate conversation use climate action terminology interchangeably, which only increases consumers' confusion of what carbon neutral actually means.[31]

25.     Further, reasonable consumers often mistake carbon neutral for "carbon zero" or "carbon free."[32]  Carbon zero companies do not produce *any* carbon in the entire supply chain,

---

[28] *Carbon-neutral*, MERRIAM-WEBSTER (2022); *see also A Beginner's Guide to Climate Neutrality*, UNITED NATIONS CLIMATE CHANGE, (Feb. 26, 2021), https://unfccc.int/blog/a-beginner-s-guide-to-climate-neutrality

[29] 30% of Americans do not know what carbon neutral means while 29% incorrectly define carbon neutral.  Eliza Carter, *Most U.S. Consumers Don't Know What 'Carbon Neutral' Means*, MORNING CONSULT (Aug. 2, 2022), https://morningconsult.com/2022/08/02/carbon-neutral-consumer-awareness/.

[30] 24% of self-identified environmentalists do not know what carbon neutral means while 32% incorrectly defined carbon neutral.  Eliza Carter, *Most U.S. Consumers Don't Know What 'Carbon Neutral' Means*, MORNING CONSULT (Aug. 2, 2022), https://morningconsult.com/2022/08/02/carbon-neutral-consumer-awareness/.

[31] *Carbon Neutral vs Net Zero – Understanding the Difference*, NATIONALGRID, https://www.nationalgrid.com/stories/energy-explained/carbon-neutral-vs-net-zero-understanding-difference (last visited Sept. 26, 2022).

[32] *See* Eliza Carter, *Most U.S. Consumers Don't Know What 'Carbon Neutral' Means*, MORNING CONSULT (Aug. 2, 2022), https://morningconsult.com/2022/08/02/carbon-neutral-consumer-awareness/.

including the raw materials, logistics, and packaging[33]  Unfortunately, no carbon zero products exist yet.

26.     Companies have further deviated from the more technical definition of "carbon neutral."  Instead, companies have claimed they are "carbon neutral" because they ostensibly offset their CO2 emissions with agroforestry projects—such as planting trees—which theoretically sequester the same amount of CO2 that the companies' activities produced.[34]

27.     Notwithstanding that reasonable consumers do not understand this is what companies mean, and that companies do not actively convey this definition to consumers, the "carbon offset" definition of "carbon neutral" is still false.  Carbon neutral companies still release CO2 into the atmosphere.  Further, even when companies claim carbon neutrality, the carbon offsetting market "is awash with challenges, fuzzy math and tough-to-prove claims."[35] For these reasons, many criticize the carbon offset economy as a form of greenwashing because it allows corporations to "buy complacency, political apathy[,] and self-satisfaction."[36]

---

[33] Gateway for Accelerated Innovation in Nuclear, *Carbon-Free Glossary*, GAIN, https://gain.inl.gov/SiteAssets/GAIN_WebinarSeries/2021.03.02_CarbonFreeFutureSeries-1/Carbon-FreeGlossary.pdf (last visited Sept. 29, 2022); *Carbon Neutral: What does that actually mean?*, CLIMATE PARTNER, https://www.climatepartner.com/en/carbon-neutral (last visited Sept. 29, 2022).

[34] *Id.*; *Carbon offset*, MERRIAM-WEBSTER (2022). "Agroforestry is the intentional integration of trees and shrubs into crop and animal farming systems to create environmental, economic, and social benefits."  *Agroforestry*, U.S. DEPARTMENT OF AGRICULTURE, https://www.usda.gov/topics/forestry/agroforestry#:~:text=Agroforestry%20is%20the%20intentional%20integration,around%20the%20world%20for%20centuries (last visited Sept. 21, 2022).

[35] *See id.*; Josh Lederman*, Corporations Are Turning to Forest Credits in the Race To Go 'Carbon-neutral.' Advocates Worry About 'Greenwashing.'*, NBC NEWS (Dec. 5, 2021), https://www.nbcnews.com/news/world/corporations-are-turning-forest-credits-race-go-carbon-neutral-advocat-rcna7259.

[36] George Monbiot, *Paying For Our Sins*, THE GUARDIAN (Oct. 18, 2006), https://www.theguardian.com/environment/2006/oct/18/green.guardiansocietysupplement; *see also* Chris Greenberg, *Carbon Offsets Are a Scam*, GREENPEACE (Nov. 10, 2021), https://www.greenpeace.org/international/story/50689/carbon-offsets-net-zero-greenwashing-scam/; Josh Lederman*, Corporations Are Turning to Forest Credits in the Race To Go 'Carbon-neutral.' Advocates Worry About 'Greenwashing.'*, NBC NEWS (Dec. 5, 2021), https://www.nbcnews.com/news/world/corporations-are-turning-forest-credits-race-go-carbon-neutral-advocat-rcna7259.

28.     The problem with the carbon offset economy is whether the offset organizations actually achieve the carbon savings promised, and "there are many more bad offsets than there are good offsets."[37]  For example, in the Amazon, pressures to cut down the rainforest overwhelm the payments being issued to protect it.[38]  That means a major carbon sink is being degraded and the associated emissions from the offset purchased are continuing unabated, with little accountability on either side of the transaction.[39]

29.     As journalist Lisa Song reports: "[i]n case after case … carbon credits hadn't offset the amount of pollution they were supposed to, or they had brought gains that were quickly reversed or that couldn't be accurately measured to begin with.  Ultimately, the polluters got a guilt-free pass to keep emitting CO2, but the forest preservation that was supposed to balance the ledger either never came or didn't last."[40]

30.     Not only are carbon offsets questionable, the FTC has also created guidelines on marketing carbon offsets because they are so complex.  The FTC guidelines provide that "[i]t is deceptive to misrepresent, directly or by implication, that a carbon offset represents emission reductions that have already occurred or will occur in the immediate future.  To avoid deception, marketers should clearly and prominently disclose if the carbon offset represents emission reductions that will not occur for two years or longer."[41]

31.     Regardless, under either the "technical" or "carbon offset" definition of "carbon neutral," Defendant's claims on the Product are deceptive and misleading.

---

[37] Umair Irfan, *Can You Really Negate Your Carbon Emissions? Carbon Offsets, Explained.*, VOX (Feb. 27, 2020), https://www.vox.com/2020/2/27/20994118/carbon-offset-climate-change-net-zero-neutral-emissions.

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] Federal Trade Commission, Green Guide (2012), https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-issues-revised-green-guides/greenguides.pdf.

2.      **The Product and Its Carbon Neutral Claim**

32.     As described above, Defendant manufactures, markets, advertises, labels, packages, and sells the Product—Evian Natural Spring Water—in a variety of sizes (300mL, 500 mL, 750 mL, 1L, and 1.5L) and in a variety of packaging (single bottle, six-pack, and twenty-four-pack).

33.     On each version of the Product, as well as on the packaging, Defendant represents that each bottle is "carbon neutral."  Defendant charges consumers a price premium based on this representation, and consumers are willing to pay more for the Product under the belief that the Product is environmentally friendly.

34.     Defendant does not define what it means by "carbon neutral" on the Product's labeling or packaging and does not direct consumers to Defendant's website or another source for any supplemental definition.  Given that Defendant does not define the term "carbon neutral," reasonable consumers would understand and believe that the term "carbo neutral" means the manufacturing of the Product—from materials used, to production, to transportation—is sustainable and does not leave a carbon footprint.

35.     However, the Product does in fact leave a carbon footprint because the Product's lifecycle still releases CO2 into the Earth's atmosphere.[42]  Accordingly, the Product is not "carbon neutral" based on how a reasonable consumer would understand the term.

36.     Moreover, even if reasonable consumers understood "carbon neutral" to mean that Defendant's investments in ostensibly eco-friendly projects offset the CO2 produced by the manufacture of the Product (and reasonable consumers do not understand this), Defendant's representations would *still* be false.  For example, Defendant relies on Lineas, the largest private

---

[42] *Climate Impact*, EVIAN, https://www.evian.com/en_us/sustainable-bottled-water/carbon-neutral/ (last visited Sept. 21, 2022).

rail freight operator in Europe, to transport the Product from Defendant's factory in Évian-les-Bains, France to retailers and consumers.[43]  "Nearly 60% of volumes [of the Product] are transported by train, the rest by road or via multimodal solutions."[44]  However, Lineas is not a carbon-neutral organization—it only *aspires* to be carbon neutral by 2030—and the process of transporting the Product releases $CO_2$ into the atmosphere.[45]

37.      Furthermore, Defendant uses the material polyethylene terephthalate ("PET") to produce the Product, and only a minority of the PET Defendant uses is recycled.[46]  The manufacture of one pound of PET plastic can produce up to three pounds of $CO_2$, which means the material Defendant uses to produce the Product emits $CO_2$.[47]

38.      Instead of actually reducing or eliminating its pollution, Defendant co-founded the Livelihoods Carbon Funds ("LCF").[48]  LCF is a fund that corporations invest in and, in turn, LCF "provide[s] upfront financing to project developers for large-scale project implementation and maintenance over periods of 10 to 20 years.  The [corporations] receive result-based payments for the risk they bear in the form of carbon credits."[49]  In other words, the Product's lifecycle produces $CO_2$ and Defendant contributes money to LCF, which invests that money in

---

[43] *Id.*; *A Thirst for Sustainability*, LINEAS (Jan. 22, 2020), https://lineas.net/en/news-overview/danone-waters.

[44] *A Thirst for Sustainability*, LINEAS (Jan. 22, 2020), https://lineas.net/en/news-overview/danone-waters.

[45] *Carbon-neutral by 2030*, LINEAS, https://lineas.net/en/news-overview/danone-waters.https://lineasnews.net/carbon-neutral-by-2030/ (last visited Sept. 22, 2022).

[46] *Id.*

[47] Marie-Luise Blue, *What Is the Carbon Footprint of a Plastic Bottle?*, SCIENCING (June 11, 2028), https://sciencing.com/carbon-footprint-plastic-bottle-12307187.html.

[48] *Climate Impact*, EVIAN, https://www.evian.com/en_us/sustainable-bottled-water/carbon-neutral/ (last visited Sept. 21, 2022).

[49] *The Livelihoods Carbon Funds*, LIVELIHOODS FUNDS, https://livelihoods.eu/lcf/ (Sept. 21, 2022).

agroforestry projects.[50]  Rather than a monetary return on investment, Defendant receives carbon offset credits that theoretically neutralize the Product's CO2 emissions.

39.     By representing the Product as carbon neutral, Defendant implies that the CO2 produced by the Product's manufacture has already been offset or will be offset in the near future.  However, according to LCF's website, the reality is that the implementation of the fund takes 10 to 20 years.[51]

40.     Therefore, contrary to Defendant's express representations, the Product is not carbon neutral.  Defendant's manufacture of the Product still causes CO2 to be released into the atmosphere, contrary to a reasonable consumer's understanding of the term "carbon neutral."  And, even if carbon neutral is meant to refer to Defendant's offset credits, Defendant's advertising is still false and misleading under the FTC's guidelines because the organizations Defendant utilizes also contribute to pollution and climate change, and any "offsets" will not happen for decades.

41.     In short, Defendant represents that the Product is carbon neutral and charges a price premium for the Product based on this representation.  However, that claim is false: the Product's lifecycle continues to emit CO2 into the atmosphere.  Instead, Defendant purchases carbon offsets that hypothetically "neutralizes" its carbon emissions, but those offsets (i) still cause pollution currently, and (ii) any "offsets" will not take place for decades.  Thus, even the claim that the Product is "carbon neutral" on the basis of "carbon offset" is false.  And

---

[50] "Agroforestry is the intentional integration of trees and shrubs into crop and animal farming systems to create environmental, economic, and social benefits."  *Agroforestry*, U.S. DEPARTMENT OF AGRICULTURE, https://www.usda.gov/topics/forestry/agroforestry#:~: text=Agroforestry%20is%20the%20intentional%20integration,around% 20the%20world%20for%20centuries (last visited Sept. 21, 2022).

[51] *The Livelihoods Carbon Funds*, LIVELIHOODS FUNDS, https://livelihoods.eu/lcf/ (Sept. 21, 2022).

Consumers would not have purchased the Product or paid substantially less for it had they

known the carbon neutral claim was not true under either definition.

## CLASS ALLEGATIONS

42.    Plaintiff seeks to represent a class defined as all persons in the United States who

purchased the Product (the "Class").  Excluded from the Class are governmental entities,

Defendant, Defendant's affiliates, parents, subsidiaries, employees, officers, directors, and co-

conspirators, and anyone who purchased the Product for resale.  Also excluded is any judicial

officer presiding over this matter and the members of their immediate families and judicial staff.

43.    Plaintiff also seeks to represent a subclass consisting of Class members who

purchased the Product in California (the "Subclass").

44.    Subject to additional information obtained through further investigation and

discovery, the foregoing definition of the Class and Subclass may be expanded or narrowed by

amendment or amended complaint.

45.    **Numerosity.**  The members of the Class and Subclass are geographically

dispersed throughout the United States and are so numerous that individual joinder is

impracticable.  Upon information and belief, Plaintiff reasonably estimates that there are

thousands of members in the Class and Subclass.  Although the precise number of Class

members is unknown to Plaintiff, the true number of Class members is known by Defendant and

may be determined through discovery.  Class members may be notified of the pendency of this

action by mail and/or publication through the distribution records of Defendant and third-party

retailers and vendors.

46.    **Existence and predominance of common questions of law and fact.**  Common

questions of law and fact exist as to all members of the Class and Subclass and predominate over

any questions affecting only individual Class members.  These common legal and factual

questions include, but are not limited to:

> (a)   whether Defendant's labeling, marketing, and promotion of the Product is false
> and misleading;
>
> (b)   whether Defendant's conduct was unfair and/or deceptive; and
>
> (c)   whether Plaintiff and the Class have sustained damages with respect to the
> common-law claims asserted, and if so, the proper measure of their damages.

47.    With respect to the Subclass, additional questions of law and fact common to the

members that predominate over questions that may affect individual members include whether

Defendant violated California's Consumers Legal Remedies Act ("CLRA"), Cal. Civil Code

§§ 1750, *et seq.*

48.    **Typicality.**  The claims of the named Plaintiff are typical of the claims of other

members of the Class in that the named Plaintiff was exposed to Defendant's false and

misleading marketing, purchased the Product, and suffered a loss as a result of that purchase.

49.    **Adequacy of Representation.**  Plaintiff is an adequate representative of the Class

and Subclass because her interests do not conflict with the interests of the Class members she

seeks to represent, she has retained competent counsel that is highly experienced in complex

consumer class action litigation, and Plaintiff intends to vigorously prosecute this action on

behalf of the Class and Subclass.  Furthermore, Plaintiff has no interests that are antagonistic to

those of the Class or Subclass.

50.    **Superiority.**  A class action is superior to all other available means for the fair

and efficient adjudication of this controversy.  The damages or other financial detriment suffered

by individual Class and Subclass members are relatively small compared to the burden and

expense of individual litigation of their claims against Defendant.  It would, thus, be virtually

impossible for the Class or Subclass on an individual basis, to obtain effective redress for the

wrongs committed against them.  Furthermore, even if Class or Subclass members could afford

such individualized litigation, the court system could not. Individualized litigation would create

the danger of inconsistent or contradictory judgments arising from the same set of facts.

Individualized litigation would also increase the delay and expense to all parties and the court

system from the issues raised by this action.  By contrast, the class action device provides the

benefits of adjudication of these issues in a single proceeding, economies of scale, and

comprehensive supervision by a single court, and presents no unusual management difficulties

under the circumstances.

## CAUSES OF ACTION

### COUNT I
**Violation of California Consumers Legal Remedies Act**
**Cal. Civ. Code §§ 1750, *et seq.***
**(On Behalf Of The California Subclass)**

51.     Plaintiff hereby incorporates by reference the allegations contained in all

preceding paragraphs of this complaint.

52.     Plaintiff brings this claim individually and on behalf of the California Subclass

who purchased the Product within the applicable statute of limitations.

53.     The CLRA provides that "unfair methods of competition and unfair or deceptive

acts or practices undertaken by any person in a transaction intended to result or which results in

the sale or lease of goods or services to any consumer are unlawful."

54.     The Product is a "good," as defined by the CLRA in California Civil Code

§ 1761(a).

55.     Defendant is a "person," as defined by the CLRA in California Civil Code

§ 1761(c).

56.     Plaintiff and members of the California Subclass are "consumers," as defined by the CLRA in California Civil Code § 1761(d).

57.     The purchase of the Product by Plaintiff and members of the California Subclass are "transactions" as defined by the CLRA in California Civil Code § 1761(e).

58.     Defendant violated the following sections of the CLRA by selling the Product to Plaintiff and the California Subclass through the false, misleading, deceptive, and fraudulent carbon neutral claim:

   (a)   Section 1770(a)(5) by representing that the Product has "characteristics, … uses [or] benefits … which [they] do not have."

   (b)   Section 1770(a)(7) by representing that the Product "are of a particular standard, quality, or grade … [when] they are of another."

   (c)   Section 1770(a)(9) by advertising the Product "with [the] intent not to sell them as advertised."

59.     Defendant's uniform and material representations and omissions regarding the Product were likely to deceive, and Defendant knew or should have known that its representations and omissions were untrue and misleading.

60.     Defendant's conduct is malicious, fraudulent, and wanton in that Defendant intentionally misled and withheld material information from consumers, including Plaintiff, to increase the sale of the Product.

61.     Plaintiff and members of the California Subclass could not have reasonably avoided such injury.  Plaintiff and members of the California Subclass were unaware of the existence of the facts that Defendant suppressed and failed to disclose, and Plaintiff and members of the California Subclass would not have purchased the Product and/or would have purchased them on different terms had they known the truth.

62.     Plaintiff and the California Subclass suffered harm as a result of Defendant's violations of the CLRA because they relied on the carbon neutral claim in deciding to purchase the Product.  The carbon neutral claim was a substantial factor.  The carbon neutral claim was material because a reasonable consumer would consider it important in deciding whether to purchase the Product.

63.     Pursuant to California Civil Code section 1782, more than thirty days prior to the filing of this complaint, on September 8, 2022, Plaintiff's counsel, acting on behalf of Plaintiff and members of the Class, mailed a notice via U.S. certified mail, return receipt requested, to Defendant at its principal places of business and care of its agent for service of process registered with the New York Secretary of State (Danone Waters of America, 1 Maple Avenue, White Plains, NY 10605; Danone Waters of America, 640 Admiralty Way 5th Floor, Marina Del Rey, CA 90292) regarding Defendant's particular violations of the California Consumers Legal Remedies Act, as set forth above, and demanding that Defendant correct and otherwise rectify those violations with respect to Plaintiff and all members of the Class.  The form, content, and delivery of the notice satisfy subsections (1) and (2) of section 1782(a).  The notice of violations and demand for remedial action, as of the filing of this complaint, did not result in adequate correction, repair, replacement, and/or other remedy by Defendant, including all remedial action set forth in the notice letter and as set forth under section 1782(c).

64.     As a direct and proximate result of Defendant's misconduct in violation of the CLRA, Plaintiff and members of the California Subclass were harmed in the amount of the purchase price they paid for the Product.  Further, Plaintiff and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Product, and any interest that would have accrued on those monies, in an amount to be proven at trial.  Accordingly, Plaintiff seeks a monetary award for violation of

this Act in the form of damages, restitution, disgorgement of ill-gotten gains to compensate Plaintiff and the California Subclass for said monies.

65.     Given that Defendant's conduct violated California Civil Code section 1780, Plaintiff and members of the California Subclass are entitled to seek, and do hereby seek, injunctive relief to put an end to Defendant's violations of the CLRA.  Plaintiff has no adequate remedy at law.  Without equitable relief, Defendant's unfair and deceptive practices will continue to harm Plaintiff and the California Subclass.

66.     Defendant's unfair, fraudulent, and unlawful conduct described herein constitutes malicious, oppressive, and/or fraudulent conduct warranting an award of punitive damages as permitted by law.  Defendant's misconduct is malicious as Defendant acted with the intent to cause Plaintiff and consumers to pay for Product that they were not, in fact, receiving. Defendant willfully and knowingly disregarded the rights of Plaintiff and consumers as Defendant was, at all times, aware of the probable dangerous consequences of its conduct and deliberately failed to avoid misleading consumers, including Plaintiff.  Defendant's misconduct is oppressive as, at all relevant times, said conduct was so vile, base, and/or contemptible that reasonable people would look down upon it and/or otherwise would despise such corporate misconduct.  Said misconduct subjected Plaintiff and consumers to cruel and unjust hardship in knowing disregard of their rights.  Defendant's misconduct is fraudulent as Defendant, at all relevant times, intentionally misrepresented and/or concealed material facts with the intent to deceive Plaintiff and consumers.  The wrongful conduct constituting malice, oppression, and/or fraud was committed, authorized, adopted, approved, and/or ratified by officers, directors, and/or managing agents of Defendant.

## COUNT II
### Violation Of New York GBL § 349
### (On Behalf Of The Class And The California Subclass)

67.     Plaintiff hereby incorporates by reference the allegations contained in all

preceding paragraphs of this complaint.

68.     Plaintiff brings this claim individually and on behalf of the proposed Class and

Subclass against Defendant.

69.     New York's General Business Law § 349 prohibits deceptive acts or practices in

the conduct of any business, trade, or commerce.

70.     In its provision of services throughout the State of New York, Defendant conducts

business and trade within the meaning and intendment of New York's General Business Law

§ 349.

71.     Decisions regarding Defendant's manufacturing, labeling, and marketing at its

New York headquarters, and the relevant conduct giving rise to this lawsuit stems from

Defendant's conduct in New York.  Accordingly, out-of-state plaintiffs have standing to sue

Defendant under GBL § 349.

72.     By the acts and conduct alleged herein, Defendant has engaged in deceptive,

unfair, and misleading acts and practices, which include, without limitation, misrepresenting that

the Product is carbon neutral when in fact the Product's lifecycle produces $CO_2$.

73.     The foregoing deceptive acts and practices were directed at consumers.

74.     The foregoing deceptive acts and practices are misleading in a material way

because they fundamentally misrepresent sustainability efforts taken by Defendant, and to induce

consumers to purchase the Product.

75.    Plaintiff and members of the Class and Subclass were injured as a result of Defendant's deceptive acts and practices because they would not have purchased the Product, or would have paid substantially less for it, if they had known that the Product was carbon neutral.

76.    By reason of this conduct, Defendant engaged in deceptive conduct in violation of GBL § 349.

77.    On behalf of herself and other members of the Class and Subclass, Plaintiff seeks to recover her actual damages or fifty dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

## COUNT III
### Violation Of New York GBL § 350
### (On Behalf Of The Class And The California Subclass)

78.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

79.    Plaintiff brings this claim individually and on behalf of the proposed Class and Subclass against Defendant.

80.    New York's General Business Law § 350 prohibits false advertising in the conduct of any business, trade, or commerce.

81.    Pursuant to said statute, false advertising is defined as "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect."

82.    Based on the foregoing, Defendant has engaged in consumer-oriented conduct that is deceptive or misleading in a material way which constitutes false advertising in violation of GBL § 350.

83.    Defendant's false, misleading, and deceptive statements and representations of fact were and are directed to consumers.

84.     Defendant's false, misleading, and deceptive statements and representations of fact were and are likely to mislead a reasonable consumer acting reasonably under the circumstances.

85.     Defendant's false, misleading, and deceptive statements and representations of fact have resulted in consumer injury or harm to the public interest.

86.     Defendant alone possessed the knowledge that the Product was not carbon neutral.

87.     As a result of Defendant's misrepresentations, Plaintiff and members of the Classes have suffered economic injury because they would not have purchased the Product, or would have paid substantially less for it, if they had known that the Product was not carbon neutral.

88.     On behalf of herself and other members of the Classes, Plaintiff seeks to recover her actual damages or five hundred dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

**COUNT IV**
**Breach of Express Warranty**
**(On Behalf Of The Class And The California Subclass)**

89.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

90.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class and Subclass against Defendant.

91.     Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, expressly warranted that the Product was "carbon neutral" and therefore does not leave a carbon footprint.

92.     In fact, the Product does in fact have a carbon footprint because the manufacturing process of the Product still causes carbon dioxide to be released into the atmosphere.

93.     As a direct and proximate cause of Defendant's breach of express warranty, Plaintiff and Class and Subclass members have been injured and harmed because they would not have purchased the Product, or would have paid substantially less for it, if they had known that the Product had a carbon footprint.

94.     On September 8, 2022, prior to filing this action, Defendant was served via certified mail with a pre-suit notice letter on behalf of Plaintiff that complied in all respects with U.C.C. §§ 2-313, 2-314, and 2-607.  Plaintiff's counsel sent Defendant a letter advising that Defendant breached an express warranty and demanded that Defendant cease and desist from such breaches and make full restitution by refunding the monies received therefrom.  A true and correct copy of Plaintiff's counsel's letter is attached hereto as **Exhibit 1**.

## COUNT V
### Breach of Implied Warranty
### (On Behalf Of The Class And The California Subclass)

95.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

96.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class and Subclass against Defendant.

97.     Defendant, as the designer, manufacturer, marketer, distributor, and/or seller of the Product, impliedly warranted that the Product was carbon neutral.

98.     Defendant breached the warranty implied in the contract for the sale of the defective Product because it could not pass without objection in the trade under the contract description and the Product does not conform to the representation because the Product

manufactured by Defendant was not carbon neutral.  As a result, Plaintiff and Class and Subclass members did not receive the goods as impliedly warranted by Defendant to be merchantable.

99.     Plaintiff and Class and Subclass members purchased the Product in reliance upon Defendant's skill and judgment and the implied warranties of fitness for the purpose.

100.     The Product was not altered by Plaintiff or Class and Subclass members.

101.     The Product was defective when it left the exclusive control of Defendant.

102.     Defendant knew that the Product would be purchased and used without additional testing by Plaintiff and Class and Subclass members.

103.     The Product was unfit for its intended purpose, and Plaintiff and Class and Subclass members did not receive the goods as warranted.

104.     As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiff and Class and Subclass members have been injured and harmed because: (a) they would not have purchased the Product on the same terms if they knew that the Product was not carbon neutral; and (b) the Product does not have the characteristics, uses, or benefits as promised by Defendant.

105.     On September 8, 2022, prior to filing this action, Defendant was served via certified mail with a pre-suit notice letter on behalf of Plaintiff that complied in all respects with U.C.C. §§ 2-313, 2-314, and 2-607.  Plaintiff's counsel sent Defendant a letter advising that Defendant breached an implied warranty and demanded that Defendant cease and desist from such breaches and make full restitution by refunding the monies received therefrom.  A true and correct copy of Plaintiff's counsel's letter is attached hereto as **Exhibit 1**.

## COUNT VI
**Unjust Enrichment**
**(On Behalf Of The Class And The California Subclass)**

106.    Plaintiff incorporates by reference the allegations contained in all proceeding paragraphs of this complaint.

107.    Plaintiff brings this claim individually and on behalf of members of the Class and Subclass against Defendant.

108.    This claim is brought under the laws of the State of California.

109.    Plaintiff and Class and Subclass members conferred benefits on Defendant by purchasing the Product.

110.    Defendant has knowledge of such benefits.

111.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and Class and Subclass members' purchases of the Product.  Retention of moneys under these circumstances is unjust and inequitable because Defendant misrepresented that the Product was capable of being composted and charged a price premium based on those representations.

112.    Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and Class and Subclass members is unjust and inequitable, Defendant must pay restitution to Plaintiff and the Class and Subclass members for their unjust enrichment, as ordered by the Court.

## COUNT VII
**Fraud**
**(On Behalf Of The Class And The California Subclass)**

113.    Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

114.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class and Subclass against Defendant.

115.    As discussed above, Defendant provided Plaintiff and Class and Subclass members with false or misleading material information about the Product, including but not limited to the fact that the Product was carbon neutral.

116.    These misrepresentations were made with knowledge of their falsehood.

117.    The misrepresentations made by Defendant, upon which Plaintiff and Class and Subclass members reasonably and justifiably relied, were intended to induce, and actually induced Plaintiff and Class and Subclass members to purchase the Product.

118.    The fraudulent actions of Defendant caused damage to Plaintiff and Class and Subclass members, who are entitled to damages and other legal and equitable relief as a result.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)    For an order certifying the Class and the Subclass under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as the representative of the Class and Subclass, and naming Plaintiff's attorneys as Class Counsel to represent the Class and Subclass members;

(b)    For an order declaring the Defendant's conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiff, the Class, and the Subclass on all counts asserted herein;

(d)    For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest in all amounts awarded;

(f)    For an order of restitution and all other forms of equitable monetary relief;

(g)    For an order awarding Plaintiff and the Class and Subclass their reasonable attorney's fees and expenses and costs of suit.

## <u>JURY TRIAL DEMANDED</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any

and all issues in this action so triable of right.

Dated: October 13, 2022                   Respectfully submitted,

                                       By: */s/ Max S. Roberts*
                                          Max S. Roberts

                                     **BURSOR & FISHER, P.A.**
                                     Max S. Roberts
                                     888 Seventh Avenue
                                     New York, NY  10019
                                     Telephone: (646) 837-7150
                                     Facsimile:  (212) 989-9163
                                     Email: mroberts@bursor.com

                                     **BURSOR & FISHER, P.A.**
                                     Brittany S. Scott (*Pro Hac Vice Forthcoming*)
                                     1990 North California Blvd., Suite 940
                                     Walnut Creek, CA 94596
                                     Telephone: (925) 300-4455
                                     Facsimile:  (925) 407-2700
                                     Email: bscott@bursor.com

                                     *Attorneys for Plaintiff*