## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEPHANIE DORRIS and JOHN AXIOTAKIS, individually and on behalf of all others similarly situated,<br><br>                Plaintiffs,<br><br>    v.<br><br>DANONE WATERS OF AMERICA,<br><br>                Defendant. | Civil Action No. 7:22-cv-08717-NSR<br><br>Hon. Nelson S. Roman<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Stephanie Dorris and John Axiotakis ("Plaintiffs"), by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief—except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge—against Defendant Danone Waters of America ("Defendant").

## <u>NATURE OF THE ACTION</u>

1.      This is a class action lawsuit on behalf of purchasers of Defendant's product, "Evian Natural Spring Water" bottled water (the "Product"), in the United States.

2.      Defendant manufactures and sells a number of water bottles under the "Evian" label.  Defendant sells this product throughout the United States, including in California.

3.      Defendant holds itself out as an environmentally friendly brand.

4.      One of Defendant's products is "Evian Natural Spring Water," which is a "wide range of convenient plastic water bottles to help hydrate and revitalize [consumers] throughout

the day."[1]  The Product comes in five different sizes: 300mL, 500 mL, 750 mL, 1L, and 1.5L,

and the Product is sold individually, in six-packs, and in twenty-four-packs.

5.      On the labels and/or packaging of all versions of the Product, Defendant

represents that the Product is "carbon neutral":






---

[1] *The Everyday Range*, EVIAN, https://www.evian.com/en_us/natural-spring-water/bottled-water/ (last visited Sept. 15, 2022).

6.      Under the FTC's "Green Guides" for environmental marketing claims, the "carbon neutral" claim is an "[u]nqualified general environmental benefit claim[]" that is "difficult to interpret and likely convey[s] a wide range of meanings."[2]  The FTC cautions marketers against making "unqualified general benefit claims" "[b]ecause it is highly unlikely that marketers can substantiate all reasonable interpretations of these claims."[3]

7.      That is precisely the case here.  Based on Defendant's "carbon neutral" representation, reasonable consumers reviewing the Product's label and packaging would believe the manufacturing of the Product is sustainable and does not leave a carbon footprint.  That representation is false: Defendant's manufacturing of the Product still causes carbon dioxide ("CO2") to be released into the atmosphere.  Accordingly, the carbon neutral claim is false and misleading because the Product's manufacturing process is not carbon neutral, and consumers would not have purchased the Product, or paid substantially less for it, had they known the carbon neutral claim was not true.  And, because Defendant cannot substantiate this reasonable interpretation of its claim, it has likewise violated 16 C.F.R. § 260.4.

8.      Defendant may contend that "carbon neutral" means that the "carbon credits" Defendant purchases theoretically "offset" the carbon emissions produced by its Product.  Defendant may also contend it is "carbon neutral" as per the standards of the Carbon Trust, a third-party agency.  Notwithstanding these explanations appear nowhere on the Product and reasonable consumers would not understand that to be the meaning of carbon neutral, those interpretations are also false and misleading.  Nowhere on the Product's packaging does Defendant disclose how it calculates its carbon neutrality, what the "Carbon Trust" standard means or how Defendant goes about meeting that standard, and whether the standards it uses are

---

[2] 16 C.F.R. § 260.4(b).

[3] *Id.*

actually "carbon neutral" in that any pollution output is truly offset by other projects.  Thus, even assuming reasonable consumers would understand "carbon neutral" to cover these offset-based interpretations, those too are false, misleading, and improperly qualified under the Green Guides.

9.      Defendant's statements are not simply a marketing gimmick.  Rather, Defendant charges more for the Product based on its representation that the Product is "carbon neutral." And, Defendant knows consumers will pay more for a Product based on representations that the Product is environmentally friendly.  Thus, Plaintiffs and other consumers have suffered an economic injury as a result of Defendant's greenwashing.  Because the Product is not actually "carbon neutral" as that term is understood by reasonable consumers—or even as Defendant may understand that term—Plaintiffs and other consumers were deprived of the benefit of their bargain in that they paid a price premium for a product they believed was "carbon neutral," but instead received a product that was not "carbon neutral."

10.     Plaintiffs are purchasers of the Product who assert claims on behalf of themselves and similarly situated purchasers of the Product for (i) violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civil Code §§ 1750, *et seq.*, (ii) violation of New York General Business Law ("GBL") § 349, (iii) violation of GBL § 350, (iv) violation of Massachusetts General Laws Chapter 93A, (v) breach of express warranty, (vi) breach of implied warranty, (vii) unjust enrichment, and (viii) fraud.

## **PARTIES**

11.     Plaintiff Stephanie Dorris is a resident of Alameda County, California who has an intent to remain there, and is therefore a citizen of California.  Plaintiff Dorris has purchased the Product multiple times.  Most recently, on August 16, 2022, Plaintiff Dorris purchased a box of the 1-liter variant of the Product from Amazon for approximately $19.99.  Prior to her purchase of the Product, Plaintiff Dorris reviewed the Product's labeling and packaging and saw that the

Product was labeled and marketed as "carbon neutral."  In purchasing the Product, Plaintiff Dorris relied on Defendant's representations that the Product was carbon neutral.  Plaintiff Dorris saw these representations prior to, and at the time of purchase, and understood them as representations and warranties that her Product was carbon neutral.  Plaintiff Dorris understood "carbon neutral" to mean that the Product's manufacturing did not produce $CO_2$ or otherwise cause pollution.  Plaintiff Dorris relied on these representations and warranties in deciding to purchase the Product.  Accordingly, those representations and warranties were part of the basis of the bargain, in that Plaintiff Dorris would not have purchased the Product on the same terms had she known those representations were not true.  In making her purchase, Plaintiff Dorris paid a substantial price premium due to the false and misleading carbon neutral claim.  Had Plaintiff Dorris known that the carbon neutral claim was false and misleading, Plaintiff Dorris would not have purchased the Product.  Plaintiff Dorris did not receive the benefit of her bargain because the Product was not, in fact, carbon neutral in that its manufacturing produced $CO_2$ or caused pollution.

12.     Plaintiff John Axiotakis is a resident of Essex County, Massachusetts who has an intent to remain there, and is therefore a citizen of Massachusetts.  Plaintiff Axiotakis has purchased the Product multiple times.  Most recently, in or about November 2022, Plaintiff Axiotakis purchased a bottle of the Product from a BJ's store in Massachusetts.  Prior to his purchase of the Product, Plaintiff Axiotakis reviewed the Product's labeling and packaging and saw that the Product was labeled and marketed as "carbon neutral."  In purchasing the Product, Plaintiff Axiotakis relied on Defendant's representations that the Product was carbon neutral. Plaintiff Axiotakis saw these representations prior to, and at the time of purchase, and understood them as representations and warranties that his Product was carbon neutral.  Plaintiff Axiotakis understood "carbon neutral" to mean that the Product's manufacturing did not produce $CO_2$ or

otherwise cause pollution.  Plaintiff Axiotakis relied on these representations and warranties in deciding to purchase the Product.  Accordingly, those representations and warranties were part of the basis of the bargain, in that Plaintiff Axiotakis would not have purchased the Product on the same terms had he known those representations were not true.  In making his purchase, Plaintiff Axiotakis paid a substantial price premium due to the false and misleading carbon neutral claim. Had Plaintiff Axiotakis known that the carbon neutral claim was false and misleading, Plaintiff Axiotakis would not have purchased the Product.  Plaintiff Axiotakis did not receive the benefit of his bargain because the Product was not, in fact, carbon neutral in that its manufacturing produced $CO_2$ or caused pollution.

13.     Defendant Danone Waters of America, Inc. is a corporation incorporated under the laws of the state of New York, with its principal place of business in White Plains, New York.  Defendant markets, sells, and distributes the Product throughout the United States, including in the States of California, Massachusetts, and New York.  Defendant manufactured, marketed, and sold the Product during the class period.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(a) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00 exclusive of interest and costs, there are over 100 members of the putative class, and at least one class member is a citizen of a state different than Defendant.

15.     This Court has personal jurisdiction over Defendant because Defendant is incorporated and maintains its principal place of business in New York.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this District.

## FACTUAL ALLEGATIONS

### A.   The Climate Crisis

17.     There is a growing concern about the climate crisis, which the United Nation describes as "the defining crisis of our time."[4]  A study in 2021 found that an astounding seventy-eight percent of people—around the globe and across all demographics—are increasingly feeling the collective threat of man-made damage to the planet.[5]  Anxieties about human-induced harm to the planet are seen across all age groups, gender, and educational and sociocultural backgrounds, with climate change ranking as the most important global environmental concern of our time, followed by water and air pollution.[6]

18.     At the crux of climate change is the "greenhouse effect."  The greenhouse effect is the natural warming of the Earth that results when gases in the atmosphere trap heat from the sun that would otherwise escape into space.[7]  While thirty percent of solar energy that reaches Earth reflects back to space, roughly seventy percent of the solar energy is absorbed by Earth's land, oceans, and atmosphere.[8]  Eventually, the heat that was absorbed by Earth is radiated back in the form of invisible infrared light.[9]  While a small amount of the infrared light continues into space, approximately ninety percent is absorbed by atmospheric gases ("greenhouse gases"), and

---

[4] *See The Climate Crisis – A Race We Can Win*, UNITED NATIONS, https://www.un.org/en/un75/climate-crisis-race-we-can-win (last visited Sept. 16, 2022); *The Climate Crisis: Working Together for Future Generations*, U.S. DEPARTMENT OF STATE, https://www.state.gov/policy-issues/climate-crisis/ (last visited Sept. 16, 2022).

[5] Michael Sheldrick, *Increasing Global Concern About The Climate Is A Message To World Leaders*, FORBES (Oct. 28, 2021), https://www.forbes.com/sites/globalcitizen/2021/10/28/increasing-global-concern-about-the-climate-is-a-message-to-world-leaders/?sh=6db94ac3c11f.

[6] *Id.*

[7] Melissa Denchak, *Greenhouse Effect 101*, NATURAL RESOURCES DEFENSE COUNCIL (July 16, 2019), https://www.nrdc.org/stories/greenhouse-effect-101.

[8] *Id.*

[9] *Id.*

these gases are redirected back to Earth, which further warms the Earth.[10]  Below is a depiction

of the greenhouse effect[11]:



19.     Greenhouse gases from human activities are the most significant driver of

observed climate change since the mid-20th century.[12]  For 800,000 years, longer than human

civilization has existed, the concentration of greenhouse gases in the atmosphere was between

200 and 280 parts per million.[13]  However, in the past century, that concentration has jumped to

more than 400 parts per million, which is driven by human activities such as burning fossil fuels

---

[10] *Id.*

[11] *Why We Measure & Track GHGs*, UMASS LOWELL, https://www.uml.edu/office-sustainability/Practices/Air-Climate/Greenhouse-Gas-Information.aspx (last visited Sept. 16, 2022).

[12] *Greenhouse Gases*, CLIMATE CHANGE RESOURCES, https://climatechangeresources.org/greenhouse-gases/ (last visited Sept. 16, 2022).

[13] Melissa Denchak, *Greenhouse Effect 101*, NATURAL RESOURCES DEFENSE COUNCIL (July 16, 2019), https://www.nrdc.org/stories/greenhouse-effect-101.

and deforestation.[14]  The higher concentrations of greenhouse gases—particularly carbon

dioxide—are causing extra heat to be trapped and climate change.[15]

    20.    Carbon dioxide is the primary greenhouse gas emitted through human activities.[16]

In 2020, CO2 accounted for about seventy-nine percent of all U.S. greenhouse gas emissions

from human activities.[17]  While CO2 is naturally present in the atmosphere, humans are

disrupting the Earth's natural carbon cycle.[18]  Specifically, humans are introducing more CO2

into the atmosphere while destroying the natural sinks—such as trees and soil—that remove and

store CO2 from the atmosphere.[19]  Thus, efforts to combat the threat of climate change are

heavily focused on the carbon cycle.

    21.    There is worldwide recognition that the Earth's climate is changing and that

climate change is a crisis.[20]  Climate change is evidenced by changing temperatures and

precipitation patterns, increases in ocean levels and acidity, melting glaciers and sea ice, changes

in frequency of extreme weather events, and shifts in ecological characteristics such as length of

harvesting seasons and bird migration patterns.[21]  Furthermore, climate change is affecting

Americans in far-reaching ways: wildfires are increasingly destroying homes and decreasing air

quality; extreme heat and downpours are affecting infrastructure like roads, rail lines, airports,

---

[14] *Id.*

[15] *Id.*

[16] *Overview of Greenhouse Gases*, US ENVIRONMENTAL PROTECTION AGENCY, https://www.epa.gov/ghgemissions/overview-greenhouse-gases (last visited Sept. 16, 2022).

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *See The Climate Crisis – A Race We Can Win*, UNITED NATIONS, https://www.un.org/en/un75/climate-crisis-race-we-can-win (last visited Sept. 16, 2022); *The Climate Crisis: Working Together for Future Generations*, U.S. DEPARTMENT OF STATE, https://www.state.gov/policy-issues/climate-crisis/ (last visited Sept. 16, 2022).

[21] *Basics of Climate Change*, US ENVIRONMENTAL PROTECTION AGENCY, https://www.epa.gov/climatechange-science/basics-climate-change (last visited Sept. 13, 2022).

port facilities, energy infrastructure, and military bases; the rise of sea levels and coastal storms has increased the risk of erosion and flooding for coastal communities; climate disruption to agriculture is projected to diminish the security of America's food supply; the changing chemistry of ocean water is altering marine-based food production and harming fishing communities; and, longer harvesting seasons increase pollen production, intensifying and lengthening the allergy season.[22]

22.     To combat the harms of climate change, nearly every nation on Earth adopted the Paris Agreement in 2015.[23]  The Paris Agreement is a legally binding international treaty, which aims to limit global warming through "global peaking" of greenhouse gas emissions as soon as possible.[24]  Subsequently, in 2021, the European Union adopted the Climate Law and, in 2022, President Biden signed the Inflation Reduction Act, both of which aim to reduce greenhouse gas emissions.[25]

23.     Because of the widespread concern about the climate crisis, consumers have increasingly sought out environmentally sustainable products.  According to a study by IBM and the National Retail Federation, nearly seventy percent of consumers in the United States and

---

[22] U.S. Global Change Research Program, *Climate Change: Impacts on Society*, GLOBALCHANGE.GOV, https://www.globalchange.gov/climate-change/impacts-society (last visited Sept. 13, 2022).

[23] *The Paris Agreement*, UNITED NATIONS CLIMATE CHANGE, https://unfccc.int/process-and-meetings/the-paris-agreement/the-paris-agreement (last visited Sept. 13, 2022).

[24] *Id.*

[25] *What is carbon neutrality and how can it be achieved by 2050?*, NEWS: EUROPEAN PARLIAMENT (Sept. 7, 2022), https://www.europarl.europa.eu/news/en/headlines/society/20190926STO62270/what-is-carbon-neutrality-and-how-can-it-be-achieved-by-2050; Nadja Popovich and Brad Plumer, *How the New Climate Bill Would Reduce Emissions*, THE NEW YORK TIMES (Aug. 12, 2022), https://www.nytimes.com/interactive/2022/08/02/climate/manchin-deal-emissions-cuts.html?name=styln-domestic-policy-bill&region=TOP_BANNER&block=storyline_menu_recirc&action=click&pgtype=Interactive&variant=show&is_new=false.

Canada think it is important that a brand is sustainable or eco-friendly.[26]  The same study also found that seventy percent of respondents who valued sustainability would be willing to pay, on average, thirty-five percent more for eco-friendly brands.[27]  In other words, modern consumers purchase products that claim to be environmentally friendly and are even willing to pay more for such products over their non-sustainable competitors.

24.     However, the trend of consumers seeking out ostensibly eco-friendly products has created a marketing tactic called "greenwashing."  "Greenwashing is the process of conveying a false impression or providing misleading information about how a company's products are more environmentally sound … [C]ompanies engaged in greenwashing typically exaggerate their claims or the benefits in an attempt to mislead consumers."[28]  Companies make greenwashing claims to "capitalize on the growing demand for environmentally sound products."[29]

25.     Defendant is one such company that has engaged in "greenwashing" through its marketing of the Product.

---

[26] Dinara Bekmagambetova, *Two-Thirds of North Americans Prefer Eco-Friendly Brands*, Study Finds, Barron's, Jan. 10, 2020, https://www.barrons.com/articles/two-thirds-of-north-americans-prefer-eco-friendly-brands-study-finds-51578661728.

[27] *Id.*

[28] GREENWASHING, INVESTOPEDIA, https://www.investopedia.com/terms/g/greenwashing.asp.

[29] *Id.*

**B.    Plaintiffs and Reasonable Consumers Were Misled by Defendant's "Carbon Neutral" Representation on the Product**

*1.    "Carbon Neutral" Is an Ambiguous and Deceptive Term*

26.    Carbon neutral is technically defined as "having or resulting in no net addition of carbon dioxide to the atmosphere."[30]  However, according to a recent study, nearly sixty percent of American consumers do not understand what the term "carbon neutral" means.[31]

27.    Even among Americans who identify as environmentalists (*i.e.*, those who have changed their consumer behavior due to a concern about climate change), less than half could correctly identify the meaning of carbon neutral.[32]  Likewise, politicians, businesses, scientists, and experts driving the climate conversation use climate action terminology interchangeably, which only increases consumers' confusion of what carbon neutral actually means.[33]

28.    Further, reasonable consumers often mistake "carbon neutral" for "carbon zero" or "carbon free."[34]  Carbon zero companies do not produce *any* carbon in the entire supply chain,

---

[30] *Carbon-neutral*, MERRIAM-WEBSTER (2022); *see also A Beginner's Guide to Climate Neutrality*, UNITED NATIONS CLIMATE CHANGE, (Feb. 26, 2021), https://unfccc.int/blog/a-beginner-s-guide-to-climate-neutrality

[31] 30% of Americans do not know what carbon neutral means while 29% incorrectly define carbon neutral.  Eliza Carter, *Most U.S. Consumers Don't Know What 'Carbon Neutral' Means*, MORNING CONSULT (Aug. 2, 2022), https://morningconsult.com/2022/08/02/carbon-neutral-consumer-awareness/.

[32] 24% of self-identified environmentalists do not know what carbon neutral means while 32% incorrectly defined carbon neutral.  Eliza Carter, *Most U.S. Consumers Don't Know What 'Carbon Neutral' Means*, MORNING CONSULT (Aug. 2, 2022), https://morningconsult.com/2022/08/02/carbon-neutral-consumer-awareness/.

[33] *Carbon Neutral vs Net Zero – Understanding the Difference*, NATIONALGRID, https://www.nationalgrid.com/stories/energy-explained/carbon-neutral-vs-net-zero-understanding-difference (last visited Sept. 26, 2022).

[34] S*ee* Eliza Carter, *Most U.S. Consumers Don't Know What 'Carbon Neutral' Means*, MORNING CONSULT (Aug. 2, 2022), https://morningconsult.com/2022/08/02/carbon-neutral-consumer-awareness/.

including the raw materials, logistics, and packaging [35]  Unfortunately, no carbon zero products exist yet.

29.     Companies have further deviated from the more technical definition of "carbon neutral."  Instead, companies have claimed they are "carbon neutral" because they ostensibly offset their CO2 emissions with agroforestry projects—such as planting trees—which theoretically sequester the same amount of CO2 that the companies' activities produced.[36]

30.     Notwithstanding that reasonable consumers do not understand this is what companies mean, and that companies like Defendant do not actively convey this definition to consumers, the "carbon offset" definition of "carbon neutral" is still questionable.  Carbon neutral companies still release CO2 into the atmosphere.  Further, even when companies claim carbon neutrality, the carbon offsetting market "is awash with challenges, fuzzy math and tough-to-prove claims."[37]  For these reasons, many criticize the carbon offset economy as a form of greenwashing because it allows corporations to "buy complacency, political apathy[,] and self-satisfaction."[38]

---

[35] Gateway for Accelerated Innovation in Nuclear, *Carbon-Free Glossary*, GAIN, https://gain.inl.gov/SiteAssets/GAIN_WebinarSeries/2021.03.02_CarbonFreeFutureSeries-1/Carbon-FreeGlossary.pdf (last visited Sept. 29, 2022); *Carbon Neutral: What does that actually mean?*, CLIMATE PARTNER, https://www.climatepartner.com/en/carbon-neutral (last visited Sept. 29, 2022).

[36] *Id.*; *Carbon offset*, MERRIAM-WEBSTER (2022). "Agroforestry is the intentional integration of trees and shrubs into crop and animal farming systems to create environmental, economic, and social benefits."  *Agroforestry*, U.S. DEPARTMENT OF AGRICULTURE, https://www.usda.gov /topics/forestry/agroforestry#:~:text=Agroforestry%20is%20the%20intentional%20integration,ar ound%20the%20world%20for%20centuries (last visited Sept. 21, 2022).

[37] *See id.*; Josh Lederman*, Corporations Are Turning to Forest Credits in the Race To Go 'Carbon-neutral.' Advocates Worry About 'Greenwashing.'*, NBC NEWS (Dec. 5, 2021), https://www.nbcnews.com/news/world/corporations-are-turning-forest-credits-race-go-carbon-neutral-advocat-rcna7259.

[38] George Monbiot, *Paying For Our Sins*, THE GUARDIAN (Oct. 18, 2006), https://www.theguardian.com/environment/2006/oct/18/green.guardiansocietysupplement; *see also* Chris Greenberg, *Carbon Offsets Are a Scam*, GREENPEACE (Nov. 10, 2021), https://www.greenpeace.org/international/story/50689/carbon-offsets-net-zero-greenwashing-scam/; Josh Lederman*, Corporations Are Turning to Forest Credits in the Race To Go 'Carbon-neutral.' Advocates Worry About 'Greenwashing.'*, NBC NEWS (Dec. 5, 2021),

31.     The problem with the carbon offset economy is whether the offset organizations actually achieve the carbon savings promised, and "there are many more bad offsets than there are good offsets."[39]   For example, in the Amazon, pressures to cut down the rainforest overwhelm the payments being issued to protect it.[40]   That means a major carbon sink is being degraded and the associated emissions from the offset purchased are continuing unabated, with little accountability on either side of the transaction.[41]

32.     As journalist Lisa Song reports: "[i]n case after case … carbon credits hadn't offset the amount of pollution they were supposed to, or they had brought gains that were quickly reversed or that couldn't be accurately measured to begin with.  Ultimately, the polluters got a guilt-free pass to keep emitting CO2, but the forest preservation that was supposed to balance the ledger either never came or didn't last."[42]

33.     Indeed, the FTC specifically created guidelines for carbon offset marketing because the complexity of offsets creates a heightened risk of misleading consumers.  The guidelines provide that:

> Given the complexities of carbon offsets, sellers should employ competent and reliable scientific and accounting methods to properly quantify claimed emission reductions and to ensure that they do not sell the same reduction more than one time.  It is deceptive to misrepresent, directly or by implication, that a carbon offset represents emission reductions that have already occurred or will occur in the immediate future.  To avoid deception, [an organization selling an offset] should clearly and prominently disclose if the carbon offset represents emission reductions that will not occur for

---

https://www.nbcnews.com/news/world/corporations-are-turning-forest-credits-race-go-carbon-neutral-advocat-rcna7259.

[39] Umair Irfan, *Can You Really Negate Your Carbon Emissions? Carbon Offsets, Explained.*, Vox (Feb. 27, 2020), https://www.vox.com/2020/2/27/20994118/carbon-offset-climate-change-net-zero-neutral-emissions.

[40] *Id.*

[41] *Id.*

[42] *Id.*

two years or longer.[43]

34.     Although Defendant is not selling offsets to consumers, the FTC's guidelines demonstrate that environmental marketing claims are unfair and/or deceptive if they go unqualified or without a clear explanation.  Further, carbon offsets are particularly complex, and thus, the FTC indicates why it is crucial for companies to properly and conspicuously advertise the *reliability* of the claimed emission reductions.  Otherwise, environmental claims such as Defendant's that its Products are carbon neutral are likely to deceive consumers.

35.     In response to these environmental marketing claims, which companies use to target the growing number of American consumers interested in environmentally friendly products, the FTC created the "Green Guides."  "The guides help marketers avoid making environmental marketing claims that are unfair or deceptive."[44]  To determine "[w]hether a particular claim is deceptive [to a general audience of consumers]," the question "depends on the *net impression* of the … label."[45]  For general environmental claims, the guidelines provide that:

> It is deceptive to misrepresent, directly or by implication, that a product …
> offers a general environmental benefit.  Unqualified general environmental
> benefit claims are difficult to interpret and likely convey a wide range of
> meanings. …  Because it is highly unlikely that marketers can substantiate
> all reasonable interpretations of these claims, marketers should not make
> unqualified general environmental benefit claims.[46]

36.     "Carbon neutral" is precisely the type of "unqualified general environmental benefit" claim that the FTC cautions marketers not to make.  As alleged above, most Americans do not understand what "carbon neutral" means, and the term is subject to multiple interpretations.  And, crucially, companies cannot "substantiate all reasonable interpretations of

---

[43] 16 C.F.R. § 260.5

[44] 16 C.F.R. § 260.1(a)

[45] 16 C.F.R. § 260.1(d) (emphasis added)

[46] 16 C.F.R. § 260.4

[this] claim[]": manufacturing processes still emit CO2, and the "carbon offset" economy is murky and highly questionable.

2.      *The Product and Its Carbon Neutral Claim*

37.     As described above, Defendant manufactures, markets, advertises, labels, packages, and sells the Product—Evian Natural Spring Water—in a variety of sizes (300mL, 500 mL, 750 mL, 1L, and 1.5L) and in a variety of packaging (single bottle, six-pack, and twenty-four-pack).

38.     On each version of the Product, as well as on the packaging, Defendant represents that each bottle is "carbon neutral." Defendant charges consumers a price premium based on this representation, and consumers are willing to pay more for the Product under the belief that the Product is environmentally friendly.

39.     Defendant does not define what it means by "carbon neutral" on the Product's labeling or packaging and does not direct consumers to Defendant's website or another source for any supplemental definition. Given that Defendant does not define the term "carbon neutral," reasonable consumers would and do understand and believe that the term "carbon neutral" means the manufacturing of the Product—from materials used, to production, to transportation—is sustainable and does not leave a carbon footprint. This representation is false because, as alleged above, there is no such thing as a "carbon zero" product. Accordingly, Defendant's carbon neutral claim misleads the reasonable consumer.

40.     Moreover, even if reasonable consumers understood "carbon neutral" to mean that Defendant's investments in ostensibly eco-friendly projects offset the CO2 produced by the manufacture of the Product (and reasonable consumers do not understand this), Defendant's representations would *still* be misleading. For example, Defendant relies on Lineas, the largest private rail freight operator in Europe, to transport the Product from Defendant's factory in

Évian-les-Bains, France to retailers and consumers.[47]  "Nearly 60% of volumes [of the Product] are transported by train, the rest by road or via multimodal solutions."[48]  However, Lineas is not a carbon-neutral organization—it only *aspires* to be carbon neutral by 2030—and the process of transporting the Product releases CO2 into the atmosphere.[49]

41.     Furthermore, Defendant uses the material polyethylene terephthalate ("PET") to produce the Product, and only a minority of the PET Defendant uses is recycled.[50]  The manufacture of one pound of PET plastic can produce up to three pounds of CO2, which means the material Defendant uses to produce the Product emits CO2.[51]

42.     Defendant also includes the Carbon Trust footprint logo on the exterior of the packaging and on the back of the individual bottles:

//

//

//

//

//

//

//

//

---

[47] *Id.*; *A Thirst for Sustainability*, LINEAS (Jan. 22, 2020), https://lineas.net/en/news-overview/danone-waters.

[48] *A Thirst for Sustainability*, LINEAS (Jan. 22, 2020), https://lineas.net/en/news-overview/danone-waters.

[49] *Carbon-neutral by 2030*, LINEAS, https://lineas.net/en/news-overview/danone-waters.https://lineasnews.net/carbon-neutral-by-2030/ (last visited Sept. 22, 2022).

[50] *Id.*

[51] Marie-Luise Blue, *What Is the Carbon Footprint of a Plastic Bottle?*, SCIENCING (June 11, 2028), https://sciencing.com/carbon-footprint-plastic-bottle-12307187.html.






43.     Carbon Trust is a third-party organization that purports to help companies

measure, manage, and reduce the footprint of their products.  If companies do this according to

Carbon Trust standards, then Carbon Trust allows companies to place the Carbon Trust logo on

the products to indicate to consumers that the company is "working to measure and reduce the

product's carbon emissions."[52]  There is a range of logos that indicate different levels of

sustainability, and Defendant received the "carbon neutral" footprint logo.  The footprint logo

indicates that the product's carbon footprint is (1) achieving ongoing reductions and (2) any

---

[52] *Product Carbon Footprint Label*, CARBON TRUST, https://www.carbontrust.com/what-we-do/assurance-and-labelling/product-carbon-footprint-label (last visited Dec. 21, 2022).

outstanding emissions are offset in accordance with the international PAS 2060 standard.[53]  This logo also required a re-certification process each year, demonstrating that "reductions have been achieved in both absolute and intensity terms against the preceding period."[54]

44.     Through its use of the footprint logo, Defendant *may* be attempting to represent that "carbon neutral" means its Product meets the Carbon Trust standard.  However, that is far from clear.  The "carbon neutral" claim on the front of each bottle is placed *completely separate* from Carbon Trust's logo, which appears only on the back of the Product or on the packaging for the six-pack variant of the Product (which not every consumer purchases).  Thus, a reasonable consumer would not understand whether the "carbon neutral" claim is based on Defendant's calculations or Carbon Trust's calculations because nowhere on the label or packaging does Defendant clarify what it means by "carbon neutral."

45.     Even assuming it was clear that, by "carbon neutral," Defendant meant the Product meets Carbon Trust standards, the claim would still be misleading.  Nowhere on the packaging or the bottle does Defendant explain what Carbon Trust is, what their carbon neutral logo means, or how Defendant goes about achieving Carbon Trust's standards.

46.     Even on Defendant's website, which Defendant does not conspicuously direct consumers to on its packaging, Defendant does not clearly explain Carbon Trust's certification process or standard.  Instead, Defendant states its Products "were certified as carbon neutral to

---

[53] *Id.*

[54] *Id.*

the international standard PAS 2060[55] by the Carbon Trust."[56]  This short statement does not explain how much Defendant reduced their emissions to be certified by Carbon Trust, what Defendant's current emissions are as opposed to how much they offset, or any of the calculations that go into the determination that the Products are indeed carbon neutral.

47.     Moreover, as discussed above, whatever carbon offsetting standards Carbon Trust chooses to use are inherently problematic.  "Climate finance consultants and environmental groups are sounding the alarm about a system [(*i.e.*, the carbon offsetting industry)] they say doesn't deliver ***anywhere near*** the carbon reductions promised but offers companies a convenient way to avoid the tougher work of actually cutting emissions."[57]  This is because "[m]uch of the time, [carbon] credits are banked for existing forests that are already trapping carbon dioxide … on the speculative assumption that they would otherwise be cut down.  In some cases, forests that generated [carbon] credits … have burned down in wildfires, releasing their carbon dioxide stores into the air."[58]  In other words, carbon credits are speculatively given or—even worse—are given to projects that burn down and ultimately emit ***more*** carbon dioxide.

---

[55] The PAS 2060 Standard was developed by the British Standards Institution.  The standard is a list of requirements for organizations to achieve in order to be "carbon neutral."  *PAS 2060: The Ideal Standard For Carbon Neutrality*, ECOACT, https://info.eco-act.com/hubfs/0%20-%20Downloads/PAS%202060/PAS%202060%20factsheet%20EN.pdf (last visited Dec. 22, 2022).

[56] *Climate Impact*, EVIAN, https://www.evian.com/en_us/sustainable-bottled-water/carbon-neutral/ (last visited Dec. 21, 2022).

[57] Josh Lederman*, Corporations Are Turning to Forest Credits in the Race To Go "Carbon-neutral." Advocates Worry About "Greenwashing."*, NBC NEWS (Dec. 5, 2021), https://www.nbcnews.com/news/world/corporations-are-turning-forest-credits-race-go-carbon-neutral-advocat-rcna7259 (emphasis added).

[58] *Id.*

In addition, journalists have reported the Carbon Trust Standard only requires companies to cut their emissions "by only 0.1% a year."[59]

48.     Regardless, even if these offset claims were true (they are not), and completely and conspicuously substantiated (they are not), the "carbon neutral" claim would still be misleading.  As the Green Guides explain:

> Even if a marketer explains, and has substantiation for, the product's specific environmental attributes, *this explanation will not adequately qualify a general environmental benefit claim if the advertisement otherwise implies deceptive claims*.  Therefore, marketers should ensure that the advertisement's context does not imply deceptive environmental claims.[60]

49.     Here, the "carbon neutral" claim implies, and reasonable consumers could and do interpret the "carbon neutral" claim to mean, that the manufacturing of the Product—from materials used, to production, to transportation—is sustainable and does not leave a carbon footprint.  As alleged above, such a claim is false because the Product's lifecycle still releases $CO_2$ into the Earth's atmosphere.[61]  And, Defendant has not properly qualified the "carbon neutral" claim and has not specified what it means by "carbon neutral."  Accordingly, the "carbon neutral" claim is still misleading because it "otherwise implies deceptive claims."

50.     The "carbon neutral" claim is accordingly an example of "greenwashing."  "Greenwashing is the process of conveying a false impression or providing misleading information about how a company's products are more environmentally sound … [C]ompanies engaged in

---

[59] Josephine Moulds, *Carbon Trust Chief: "We Are on the Side of the Good Guys."  Not Everyone Agrees*, THE GUARDIAN, Mar. 12, 2012, https://www.theguardian.com/environment/2012/mar/12/carbon-trust-tom-delay-profile (last accessed Dec. 22, 2022).

[60] 16 C.F.R. § 260.4(d) (emphasis added).

[61] Josh Lederman, *Corporations Are Turning to Forest Credits in the Race To Go "Carbon-neutral."  Advocates Worry About "Greenwashing."*

greenwashing typically exaggerate their claims or the benefits in an attempt to mislead consumers."[62]

51.     Companies make greenwashing claims to "capitalize on the growing demand for environmentally sound products."[63]  For example, over the past five years, there has been a 71% rise in online searches for sustainable goods.[64]

52.     Further, according to a study by IBM and the National Retail Federation, nearly 70% of consumers in the United States and Canada think it is important that a brand is sustainable or eco-friendly.  The same study also found that 70% of respondents who valued sustainability would be willing to pay, on average, 35% more for eco-friendly brands.[65]

53.     In other words, modern consumers purchase products that claim to be environmentally friendly and are even willing to pay more for such products over their non-sustainable competitors.  Defendant expressly preys on such consumers by charging more for its Product based on the "carbon neutral" representation than it otherwise would

54.     In short, Defendant represents that the Product is "carbon neutral" and charges a price premium for the Product based on this representation.  Because Defendant does not qualify this claim in a conspicuous or reasonable manner, the "carbon neutral" claim is an example of a "general environmental benefit" claim, for which Defendant must "substantiate all reasonable interpretations of" to avoid deception.  Defendant cannot do so.  Reasonable consumers such as Plaintiffs interpret "carbon neutral" to mean the Product's lifecycle does not emit CO2 into the

---

[62] GREENWASHING, INVESTOPEDIA, https://www.investopedia.com/terms/g/greenwashing.asp.

[63] *Id.*

[64] CRISTIANNE CLOSE, THE GLOBAL ECO-WAKENING: HOW CONSUMERS ARE DRIVING SUSTAINABILITY, WORLD ECONOMIC FORUM, May 18, 2021, https://www.weforum.org/agenda/2021/05/eco-wakening-consumers-driving-sustainability/.

[65] Dinara Bekmagambetova, *Two-Thirds of North Americans Prefer Eco-Friendly Brands, Study Finds*, BARRON'S, Jan. 10, 2020, https://www.barrons.com/articles/two-thirds-of-north-americans-prefer-eco-friendly-brands-study-finds-51578661728.

atmosphere, but the Product's lifecycle *does* emit CO2 into the atmosphere.  Thus, consumers would not have purchased the Product or paid substantially less for it had they known the carbon neutral claim was not true.  Further, even if the claim is meant to convey that Defendant purchases carbon offsets that ostensibly "neutralizes" its carbon emissions, or is certified under the Carbon Trust standard, that too would be false and misleading, as experts note carbon offsets are "awash with challenges, fuzzy math and tough-to-prove claims"[66] with "a long history of overpromising and underdelivering."[67]  Moreover, Defendant does not substantiate this claim with how it reduces its emissions or calculates the carbon offsets.  And, even if Defendant did properly substantiate and qualify its offsets, the "carbon neutral" claim would still be misleading because it can be interpreted to mean the Product does not emit CO2 into the atmosphere (which it does).  Accordingly, the "carbon neutral" claim is misleading and deceives consumers into paying more for the Product than they otherwise would have.

## CLASS ALLEGATIONS

55.     Plaintiffs seek to represent a class defined as all persons in the United States who purchased the Product (the "Class").  Excluded from the Class are governmental entities, Defendant, Defendant's affiliates, parents, subsidiaries, employees, officers, directors, and co-conspirators, and anyone who purchased the Product for resale.  Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

56.     Plaintiff Dorris also seeks to represent a subclass consisting of Class members who purchased the Product in California (the "California Subclass").

---

[66]  Josh Lederman, *Corporations Are Turning to Forest Credits in the Race To Go "Carbon-neutral." Advocates Worry About "Greenwashing."*.

[67] Umair Irfan, *Can You Really Negate Your Carbon Emissions? Carbon Offsets, Explained.*, VOX (Feb. 27, 2020), https://www.vox.com/2020/2/27/20994118/carbon-offset-climate-change-net-zero-neutral-emissions.

57.     Plaintiff Axiotakis also seeks to represent a subclass consisting of Class members who purchased the Product in Massachusetts (the "Massachusetts Subclass").

58.     Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class and Subclasses may be expanded or narrowed by amendment or amended complaint.

59.     **Numerosity.**  The members of the Class and Subclasses are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable.  Upon information and belief, Plaintiffs reasonably estimate that there are thousands of members in the Class and Subclasses.  Although the precise number of Class members is unknown to Plaintiffs, the true number of Class members is known by Defendant and may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

60.     **Existence and predominance of common questions of law and fact.**  Common questions of law and fact exist as to all members of the Class and Subclasses and predominate over any questions affecting only individual Class members.  These common legal and factual questions include, but are not limited to:

> (a)   whether Defendant's labeling, marketing, and promotion of the Product is false and misleading;

> (b)   whether Defendant's conduct was unfair and/or deceptive; and

> (c)   whether Plaintiffs and the Class have sustained damages with respect to the common-law claims asserted, and if so, the proper measure of their damages.

61.     With respect to the Subclasses, additional questions of law and fact common to the members that predominate over questions that may affect individual members include

whether Defendant violated California's Consumers Legal Remedies Act ("CLRA"), Cal. Civil Code §§ 1750, *et seq.*, and whether Defendant violates provisions of Massachusetts law.

62.    **Typicality.**  The claims of the named Plaintiffs are typical of the claims of other members of the Class in that the named Plaintiffs were exposed to Defendant's false and misleading marketing, purchased the Product, and suffered a loss as a result of that purchase.

63.    **Adequacy of Representation.**  Plaintiffs are adequate representatives of the Class and Subclasses because their interests do not conflict with the interests of the Class members they seek to represent, they have retained competent counsel that is highly experienced in complex consumer class action litigation, and Plaintiffs intend to vigorously prosecute this action on behalf of the Class and Subclasses.  Furthermore, Plaintiffs have no interests that are antagonistic to those of the Class or Subclasses.

64.    **Superiority.**  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class and Subclasses members are relatively small compared to the burden and expense of individual litigation of their claims against Defendant.  It would, thus, be virtually impossible for the Class or Subclasses on an individual basis, to obtain effective redress for the wrongs committed against them.  Furthermore, even if Class or Subclass members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

## CAUSES OF ACTION

### COUNT I
**Violation of California Consumers Legal Remedies Act**
**Cal. Civ. Code §§ 1750, *et seq.***
**(On Behalf Of The California Subclass)**

65.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

66.     Plaintiff Dorris brings this claim individually and on behalf of the California California Subclass who purchased the Product within the applicable statute of limitations.

67.     The CLRA provides that "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful."

68.     The Product is a "good," as defined by the CLRA in California Civil Code § 1761(a).

69.     Defendant is a "person," as defined by the CLRA in California Civil Code § 1761(c).

70.     Plaintiff Dorris and members of the California Subclass are "consumers," as defined by the CLRA in California Civil Code § 1761(d).

71.     The purchase of the Product by Plaintiff Dorris and members of the California Subclass are "transactions" as defined by the CLRA in California Civil Code § 1761(e).

72.     Defendant violated the following sections of the CLRA by selling the Product to Plaintiff Dorris and the California Subclass through the false, misleading, deceptive, and fraudulent carbon neutral claim:

(a)     Section 1770(a)(5) by representing that the Product has "characteristics … uses [or] benefits … which [they] do not have."

(b)   Section 1770(a)(7) by representing that the Product "are of a

particular standard, quality, or grade … [when] they are of another."

(c)   Section 1770(a)(9) by advertising the Product "with [the] intent not

to sell them as advertised."

73.   Defendant's uniform and material representations and omissions regarding the

Product were likely to deceive, and Defendant knew or should have known that its

representations and omissions were untrue and misleading.

74.   Defendant's conduct is malicious, fraudulent, and wanton in that Defendant

intentionally misled and withheld material information from consumers, including Plaintiff, to

increase the sale of the Product.

75.   Plaintiff Dorris and members of the California Subclass could not have

reasonably avoided such injury.  Plaintiff Dorris and members of the California Subclass were

unaware of the existence of the facts that Defendant suppressed and failed to disclose, and

Plaintiff Dorris and members of the California Subclass would not have purchased the Product

and/or would have purchased them on different terms had they known the truth.

76.   Plaintiff Dorris and the California Subclass suffered harm as a result of

Defendant's violations of the CLRA because they relied on the carbon neutral claim in deciding

to purchase the Product.  The carbon neutral claim was a substantial factor.  The carbon neutral

claim was material because a reasonable consumer would consider it important in deciding

whether to purchase the Product.

77.   Pursuant to California Civil Code section 1782, more than thirty days prior to the

filing of this complaint, on September 8, 2022, Plaintiff Dorris's counsel, acting on behalf of

Plaintiff Dorris and members of the California Subclass, mailed a notice via U.S. certified mail,

return receipt requested, to Defendant at its principal places of business and care of its agent for

service of process registered with the New York Secretary of State (Danone Waters of America, 1 Maple Avenue, White Plains, NY 10605; Danone Waters of America, 640 Admiralty Way 5th Floor, Marina Del Rey, CA 90292) regarding Defendant's particular violations of the California Consumers Legal Remedies Act, as set forth above, and demanding that Defendant correct and otherwise rectify those violations with respect to Plaintiff Dorris and all members of the Subclass.  The form, content, and delivery of the notice satisfy subsections (1) and (2) of section 1782(a).  The notice of violations and demand for remedial action, as of the filing of this complaint, did not result in adequate correction, repair, replacement, and/or other remedy by Defendant, including all remedial action set forth in the notice letter and as set forth under section 1782(c).

78.     As a direct and proximate result of Defendant's misconduct in violation of the CLRA, Plaintiff Dorris and members of the California Subclass were harmed in the amount of the purchase price they paid for the Product.  Further, Plaintiff Dorris and members of the California Subclass have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Product, and any interest that would have accrued on those monies, in an amount to be proven at trial.  Accordingly, Plaintiff Dorris seeks a monetary award for violation of this Act in the form of damages, restitution, disgorgement of ill-gotten gains to compensate Plaintiff Dorris and the California Subclass for said monies.

79.     Given that Defendant's conduct violated California Civil Code section 1780, Plaintiff Dorris and members of the California Subclass are entitled to seek, and do hereby seek, injunctive relief to put an end to Defendant's violations of the CLRA.  Plaintiff Dorris has no adequate remedy at law.  Without equitable relief, Defendant's unfair and deceptive practices will continue to harm Plaintiff and the California Subclass.

80.      Defendant's unfair, fraudulent, and unlawful conduct described herein constitutes malicious, oppressive, and/or fraudulent conduct warranting an award of punitive damages as permitted by law.  Defendant's misconduct is malicious as Defendant acted with the intent to cause Plaintiff Dorris and consumers to pay for Product that they were not, in fact, receiving. Defendant willfully and knowingly disregarded the rights of Plaintiff Dorris and consumers as Defendant was, at all times, aware of the probable dangerous consequences of its conduct and deliberately failed to avoid misleading consumers, including Plaintiff Dorris.  Defendant's misconduct is oppressive as, at all relevant times, said conduct was so vile, base, and/or contemptible that reasonable people would look down upon it and/or otherwise would despise such corporate misconduct.  Said misconduct subjected Plaintiff Dorris and consumers to cruel and unjust hardship in knowing disregard of their rights.  Defendant's misconduct is fraudulent as Defendant, at all relevant times, intentionally misrepresented and/or concealed material facts with the intent to deceive Plaintiff Dorris and consumers.  The wrongful conduct constituting malice, oppression, and/or fraud was committed, authorized, adopted, approved, and/or ratified by officers, directors, and/or managing agents of Defendant.

**<u>COUNT II</u>**
**Violation Of New York GBL § 349**
**(On Behalf Of The Class And The Subclasses)**

81.      Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

82.      Plaintiffs bring this claim individually and on behalf of the proposed Class and Subclasses against Defendant.

83.      New York's General Business Law § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

84.     In its provision of services throughout the State of New York, Defendant conducts business and trade within the meaning and intendment of New York's General Business Law § 349.

85.     Important decisions regarding Defendant's manufacturing, labeling, and marketing occur at its New York headquarters, and the relevant conduct giving rise to this lawsuit stems from Defendant's conduct in New York.  Indeed, a number of Defendant's employees involved in the marketing of the Product work out of Defendant's New York headquarters.  Accordingly, out-of-state plaintiffs have standing to sue Defendant under GBL § 349.

86.     By the acts and conduct alleged herein, Defendant has engaged in deceptive, unfair, and misleading acts and practices, which include, without limitation, misrepresenting that the Product is carbon neutral when in fact the Product's lifecycle produces CO2.

87.     The foregoing deceptive acts and practices were directed at consumers.

88.     The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent sustainability efforts taken by Defendant, and to induce consumers to purchase the Product.

89.     Plaintiffs and members of the Class and Subclasses were injured as a result of Defendant's deceptive acts and practices because they would not have purchased the Product, or would have paid substantially less for it, if they had known that the Product was not carbon neutral.

90.     By reason of this conduct, Defendant engaged in deceptive conduct in violation of GBL § 349.

91.     On behalf of themselves and other members of the Class and Subclasses, Plaintiffs seek to recover their actual damages or fifty dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

## COUNT III
### Violation Of New York GBL § 350
### (On Behalf Of The Class And The Subclasses)

92.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

93.     Plaintiffs bring this claim individually and on behalf of the proposed Class and Subclasses against Defendant.

94.     New York's General Business Law § 350 prohibits false advertising in the conduct of any business, trade, or commerce.

95.     Pursuant to said statute, false advertising is defined as "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect."

96.     Based on the foregoing, Defendant has engaged in consumer-oriented conduct that is deceptive or misleading in a material way which constitutes false advertising in violation of GBL § 350.

97.     Important decisions regarding Defendant's manufacturing, labeling, and marketing occur at its New York headquarters, and the relevant conduct giving rise to this lawsuit stems from Defendant's conduct in New York.  Indeed, a number of Defendant's employees involved in the marketing of the Product work out of Defendant's New York headquarters.  Accordingly, out-of-state plaintiffs have standing to sue Defendant under GBL § 350.

98.     Defendant's false, misleading, and deceptive statements and representations of fact were and are directed to consumers.

99.     Defendant's false, misleading, and deceptive statements and representations of fact were and are likely to mislead a reasonable consumer acting reasonably under the circumstances.

100.    Defendant's false, misleading, and deceptive statements and representations of fact have resulted in consumer injury or harm to the public interest.

101.    Defendant alone possessed the knowledge that the Product was not carbon neutral.

102.    As a result of Defendant's misrepresentations, Plaintiffs and members of the Class and Subclasses have suffered economic injury because they would not have purchased the Product, or would have paid substantially less for it, if they had known that the Product was not carbon neutral.

103.    On behalf of themselves and other members of the Class and Subclasses, Plaintiffs seek to recover their actual damages or five hundred dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

### COUNT IV
### Violation of Mass. Gen. Laws ch. 93A
### (On Behalf Of The Class And The Subclasses)

104.    Plaintiff Axiotakis repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

105.    Plaintiff Axiotakis brings this claim individually and on behalf of the members of the Massachusetts Subclass against Defendant.

106.    This action is appropriate because pursuant to General Law Chapter 93A:9(2):

  a) The unfair and deceptive act or practice committed by Defendant has caused similar injury to Plaintiff Axiotakis as to numerous other persons similarly situated which Plaintiff Axiotakis fairly represents.

  b) Plaintiff Axiotakis brings this action on behalf of himself and all other persons within the Commonwealth similarly situated, with exclusions previously noted.

      c)   Given the practice detailed above has persisted over time for many years and that the Defendant has, on information and belief, market, distribute and sell to retail locations in the Commonwealth, it would be impractical, if not impossible to seek relief for consumers on an individual basis.

107.    Defendant violated and continues to violate 940 [Mass. Code Regs.] 6[.]01 and violate the Federal Trade Commission Act[68], 15 U.S.C. § 45(a)(1), 16 C.F.R. § 260.4, and the CLRA, as alleged herein.

108.    Defendant's misrepresentations and other conduct, described herein, violated the "unfair" prong of Gen. Mass. Laws ch. 93A in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the gravity of the conduct outweighs any alleged benefits, and Defendant's competitors do not engage in the same unlawful, unfair and deceptive practice.

109.    Defendant violated the deceptive prong of Gen. Mass. Laws ch. 93A by misrepresenting that the Products are carbon neutral.

110.    Plaintiff Axiotakis and the Massachusetts Subclass Members lost money or property as a result of Defendant's violations of Gen. Mass. Laws ch. 93A because: (a) they would not have purchased the Products on the same terms if they knew that the Products produced $CO_2$ (b) they paid a substantial price premium compared to other water bottles due to Defendant's misrepresentations; and (c) the Products do not have the characteristics, uses, or benefits as promised.

111.    The acts or practices engaged in by Defendant as detailed herein above constitute unfair and deceptive trade practices within the meaning of statutory and case law developed under General Law Chapter 93A, and under applicable sections of the code of Massachusetts

---

[68] Pursuant to the Federal Trade Commission Act, "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful." 15 U.S.C. § 45(a).

Regulations and the herein cited provisions of the Federal Trade Commission Act, and further constitute "trade and commerce" as defined under Chapter 93A:1 and other applicable law.

112.    A demand letter as specified by Mass. Gen. Laws ch. 93A:9(3) was sent to Defendant's counsel on January 4, 2023.  A true and correct copy of Plaintiffs' counsel's letter is attached hereto as **Exhibit 2**.

113.    Plaintiff Axiotakis and the Massachusetts Subclass Members are entitled to damages and equitable relief as a result of Defendant's conduct.

**<u>COUNT V</u>**
**Breach of Express Warranty**
**(On Behalf Of The Class And The Subclasses)**

114.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

115.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and Subclasses against Defendant.

116.    Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, expressly warranted that the Product was "carbon neutral" and therefore does not leave a carbon footprint.

117.    In fact, the Product does in fact have a carbon footprint because the manufacturing process of the Product still causes carbon dioxide to be released into the atmosphere.

118.    As a direct and proximate cause of Defendant's breach of express warranty, Plaintiffs and members of the Class and Subclasses have been injured and harmed because they would not have purchased the Product, or would have paid substantially less for it, if they had known that the Product had a carbon footprint.

119.     On September 8, 2022, prior to filing this action, Defendant was served via certified mail with a pre-suit notice letter on behalf of Plaintiff Dorris that complied in all respects with U.C.C. §§ 2-313, 2-314, and 2-607.  The letter was sent on behalf of Plaintiff Dorris on behalf of herself and all other consumers.  Plaintiffs' counsel sent Defendant a letter advising that Defendant breached an express warranty and demanded that Defendant cease and desist from such breaches and make full restitution by refunding the monies received therefrom. A true and correct copy of Plaintiffs' counsel's letter is attached hereto as **Exhibit 1**.

120.     A demand letter was also sent to Defendant's counsel on January 4, 2023 on behalf of Plaintiff Axiotakis.  Plaintiffs' counsel's letter advised that Defendant breached an express warranty and demanded that Defendant cease and desist from such breaches and make full restitution by refunding the monies received therefrom.  A true and correct copy of Plaintiffs' counsel's letter is attached hereto as **Exhibit 2**.

**COUNT VI**
**Breach of Implied Warranty**
**(On Behalf Of The Class And The Subclasses)**

121.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

122.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and Subclasses against Defendant.

123.     Defendant, as the designer, manufacturer, marketer, distributor, and/or seller of the Product, impliedly warranted that the Product was carbon neutral.

124.     Defendant breached the warranty implied in the contract for the sale of the defective Product because it could not pass without objection in the trade under the contract description and the Product does not conform to the representation because the Product manufactured by Defendant was not carbon neutral.  As a result, Plaintiffs and members of the

Class and Subclasses did not receive the goods as impliedly warranted by Defendant to be merchantable.

125.    Plaintiffs and members of the Class and Subclasses purchased the Product in reliance upon Defendant's skill and judgment and the implied warranties of fitness for the purpose.

126.    The Product was not altered by Plaintiffs and members of the Class and Subclasses.

127.    The Product was defective when it left the exclusive control of Defendant.

128.    Defendant knew that the Product would be purchased and used without additional testing by Plaintiffs and members of the Class and Subclasses.

129.    The Product was unfit for its intended purpose, and Plaintiffs and members of the Class and Subclasses did not receive the goods as warranted.

130.    As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiffs and members of the Class and Subclasses have been injured and harmed because: (a) they would not have purchased the Product on the same terms if they knew that the Product was not carbon neutral; and (b) the Product does not have the characteristics, uses, or benefits as promised by Defendant.

131.    On September 8, 2022, prior to filing this action, Defendant was served via certified mail with a pre-suit notice letter on behalf of Plaintiff Dorris that complied in all respects with U.C.C. §§ 2-313, 2-314, and 2-607.  The letter was sent on behalf of Plaintiff Dorris on behalf of herself and all other consumers.  Plaintiffs' counsel sent Defendant a letter advising that Defendant breached an implied warranty and demanded that Defendant cease and desist from such breaches and make full restitution by refunding the monies received therefrom. A true and correct copy of Plaintiffs' counsel's letter is attached hereto as **Exhibit 1**.

132.    A demand letter was also sent to Defendant's counsel on January 4, 2023 on behalf of Plaintiff Axiotakis.  Plaintiffs' counsel's letter advised that Defendant breached an implied warranty and demanded that Defendant cease and desist from such breaches and make full restitution by refunding the monies received therefrom.  A true and correct copy of Plaintiffs' counsel's letter is attached hereto as **Exhibit 2**.

**COUNT VII**
**Unjust Enrichment**
**(On Behalf Of The Class And The Subclasses)**

133.    Plaintiffs incorporate by reference the allegations contained in all proceeding paragraphs of this complaint.

134.    Plaintiffs bring this claim individually and on behalf of members of the Class and Subclasses against Defendant.

135.    This claim is brought under the laws of the States of California and Massachusetts.

136.    Plaintiffs and members of the Class and Subclasses conferred benefits on Defendant by purchasing the Product.

137.    Defendant has knowledge of such benefits.

138.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs' and members of the Class and Subclasses' purchases of the Product.  Retention of moneys under these circumstances is unjust and inequitable because Defendant misrepresented that the Product was capable of being composted and charged a price premium based on those representations.

139.    Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiffs and members of the Class and Subclasses is unjust and inequitable, Defendant must

pay restitution to Plaintiffs and members of the Class and Subclasses for their unjust enrichment, as ordered by the Court.

<u>COUNT VIII</u>
**Fraud**
**(On Behalf Of The Class And The Subclasses)**

140.    Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

141.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and Subclasses against Defendant.

142.    As discussed above, Defendant provided Plaintiffs and members of the Class and Subclasses with false or misleading material information about the Product, including but not limited to the fact that the Product was carbon neutral.

143.    These misrepresentations were made with knowledge of their falsehood.

144.    The misrepresentations made by Defendant, upon which Plaintiffs and members of the Class and Subclasses reasonably and justifiably relied, were intended to induce, and actually induced Plaintiffs and members of the Class and Subclasses to purchase the Product.

145.    The fraudulent actions of Defendant caused damage to Plaintiffs and members of the Class and Subclasses, who are entitled to damages and other legal and equitable relief as a result.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

(a)    For an order certifying the Class and the Subclasses under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiffs as the representative of the Class and Subclasses, and naming Plaintiffs' attorneys as Class Counsel to represent the Class and Subclasses;

(b)    For an order declaring the Defendant's conduct violates the statutes

referenced herein;

(c)     For an order finding in favor of Plaintiffs, the Class, and the Subclasses on all counts asserted herein;

(d)     For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)     For prejudgment interest in all amounts awarded;

(f)     For an order of restitution and all other forms of equitable monetary relief;

(g)     For an order awarding Plaintiffs and the Class and Subclasses their reasonable attorney's fees and expenses and costs of suit.

## **JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Dated: January 5, 2023                    Respectfully submitted,

By: */s/ Max S. Roberts*
        Max S. Roberts

**BURSOR & FISHER, P.A.**
Max S. Roberts
888 Seventh Avenue
New York, NY  10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
Email: mroberts@bursor.com

**BURSOR & FISHER, P.A.**
Brittany S. Scott (*Pro Hac Vice Forthcoming*)
Emily A. Horne (*Pro Hac Vice Forthcoming*)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
Email: bscott@bursor.com
            ehorne@bursor.com

*Attorneys for Plaintiffs*